## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:12-cv-00243-MR-DLH

LAWRENCE E. CALLAHAN, )
)
Plaintiff, )
) **MEMORANDUM OF**
vs. ) **DECISION AND ORDER**
)
BANK OF AMERICA, N.A., )
)
Defendant. )
_____ )

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 33].

## I.    PROCEDURAL BACKGROUND

This action arises from the Plaintiff's purchase of Lot 19 and Lot 20

(the "Lots") in Grey Rock at Lake Lure ("Grey Rock"), a planned resort

community in North Carolina.  After meeting with Grey Rock's developer,

LR Buffalo Creek, LLC (together with its parent company Land Resource,

LLC, "Land Resource") and picking his Lot, the Plaintiff turned to Bank of

America to finance his purchase.  Land Resource failed to complete the

infrastructure and amenities in Grey Rock and subsequently became

insolvent, leaving the Plaintiff owning land with a value significantly lower

than the original purchase price.  The Plaintiff now brings this action

against Bank of America, seeking to hold his lender legally responsible for his losses.

The Plaintiff initially brought suit in one mass action with other borrower-plaintiffs on December 8, 2011, but the Court severed all claims. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011). The Plaintiff then refiled an individual Complaint. Following the Court's Order granting in part and denying in part Bank of America's Motion to Dismiss, only Plaintiff's claims for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act ("Chapter 75") remain.

Bank of America now seeks summary judgment on the Plaintiff's remaining claims. For the reasons that follow, the Bank's motion will be granted.

## II.    STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id. Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III. FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a summary of the relevant facts.

The Plaintiff Lawrence Callahan holds a degree in Economics with a minor in Business, and lives in River Edge, New Jersey. [Doc. 33-3, Deposition of Lawrence Callahan ("Callahan Dep.") at 4, 9, 13]. The Plaintiff first learned about Grey Rock in 2004 at the Developer's sales presentation for undeveloped lots in RiverSea Plantation, a development near Wilmington, North Carolina. [Doc. 33-3, Callahan Dep. at 20, 21, 22, 32-33].

The Plaintiff purchased two RiverSea lots in 2004, one funded by Waccamaw Bank and one funded by Carolina First Bank. [Doc. 33-4, Deed of Trust, RiverSea Lot 193; Doc. 33-5, Deed of Trust, RiverSea Lot 176]. The Plaintiff then visited Grey Rock for a weekend at the Developer's invitation in August 2004. [Doc. 33-3, Callahan Dep. at 37]. During the weekend, the Plaintiff attended several sales presentations wherein the Developer previewed Grey Rock's planned luxury amenities. [Id. at 53]. No Bank representatives were present during this visit. [Id. at 36].

In September 2004, the Plaintiff attended yet another Developer sales presentation in New Jersey. [Id. at 54]. The Plaintiff testified that at the sales presentation, a representative of the Developer selected four Grey Lock lots for the Plaintiff to purchase. [Id. at 54-55]. During the

presentation, the Plaintiff signed reservation agreements for the Lots. [Id. at 68, 70; Docs. 33-6 and 33-7, Reservation Agreements]. No Bank of America representatives were present at this sales presentation, and the Plaintiff never received any marketing materials from or mentioning Bank of America. [Id. at 57, 77; Doc. 33-8, Plaintiffs' Responses to First Requests for Admission at ¶9].

The Plaintiff had no contact with anyone from the Bank until December 2004 when he spoke with Trey Ford, a Bank loan officer, in order to start the loan application process. [Doc. 33-3, Callahan Dep. at 73, 86, 87]. During their conversations, Ford stated that he believed the Plaintiff "got a good deal" on the Lots and that he "would most likely make money" and should "see some good appreciation." [Id. at 92-93, 96-97]. Ford did not discuss the Developer with the Plaintiff and did not guarantee that the Developer would complete the project at Grey Rock. [Id. at 89, 91]. Ford also told the Plaintiff about how he would be able to sell lots he acquired before having to start making mortgage payments; about the Plaintiff receiving the deepest discounts offered; about the fact that he had received "a great deal"; about price appreciation of 20 to 30% of lot values between his purchase and the grand opening; about special financing incentives being offered; and about rising land prices in North Carolina due

to people moving there.  [Doc. 35-4, Plaintiff's Rule 26 Initial Disclosures at 3-4].

Although the Plaintiff testified that he signed the Purchase Agreement for the Lots in January 2005, the Purchase Agreement's "effective date" is September 8, 2004.  [Id. at 61-62; Doc. 33-9, Purchase Agreement].  The Plaintiff admitted that he "didn't ask a lot of questions about" the Purchase Agreement.  [Id. at 60].  He did not negotiate the purchase price for the Lots because he believed that the purchase price of $209,800.00 was a fair price, due to the Developer's representation that the price was lower than what the Lots would ordinarily "go for."  [Id. at 62, 76].  The Plaintiff closed on the purchase of the two other lots that the Developer's representative selected for him — Grey Rock Lots 86 and 87 both financed by Waccamaw Bank—on January 18, 2005.  [Docs. 33-10 and 33-11, Deeds of Trust]. Weeks later, on February 24, 2005, the Plaintiff closed on the Lots financed by Bank of America.  [Doc. 33-3, Callahan Dep. at 78; Doc. 33-12, Deed of Trust; Doc. 33-13, Adjustable Rate Note].

The Plaintiff admits that, prior to closing, he did not investigate the value of the Lots, and did not obtain or even review an appraisal.  [Doc. 33-3 at 74, 79].  The Plaintiff claims that he relied on Bank of America to order an appraisal during the underwriting process, that he believed the Bank

would "protect the investment," and that Ford told him that the appraisal "looked good." [Id. at 79, 107-08]. Bank of America never discouraged the Plaintiff from visiting the Lots prior to closing or from hiring an appraiser to value the Lots. [Id. at 103, 104].

Just a few months after closing, the Plaintiff "already had a feeling things weren't going well" due to the lack of progress at Grey Rock. [Id. at 81]. As the Plaintiff testified, in late 2005 he was "surprised and concerned" as the Developer "was doing nothing at Grey Rock. When I came down a year later [after the August 2004 visit], it looked virtually no different than ... when I had bought." [Id. at 41, 44]. Then in 2006, he became aware of Grey Rock lots being sold at discount and determined that he was the victim of fraud. [Doc. 33-14, September 20, 2009 Letter]. In 2007 or 2008, a group of Grey Rock purchasers, including the Plaintiff, researched the original plats for the Grey Rock development. [Doc. 33-3, Callahan Dep. at 45, 49]. At that time, the Plaintiff learned that Lot 19 had a "severe encroachment," and he hired an engineering firm and an attorney who attempted to address the issue with the Developer, to no avail. [Id. at 47-48].

As previously noted, the Plaintiff initiated the present suit as part of a mass action with other borrower-plaintiffs on December 8, 2011. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011).

## IV. DISCUSSION

### A. Statute of Limitations

In the present case, the Plaintiff asserts claims for fraud, violations of Chapter 75, and violations of ILSA. Under North Carolina law, the statute of limitations applicable to fraud claims is three years. See N.C. Gen. Stat. § 1-52(9). This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence." Hunter v. Guardian Life Ins. Co., 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, disc. rev. denied, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations. See N.C. Gen. Stat. § 75-16.2. While a Chapter 75 claim generally accrues when the violation of the statute occurs, see Jones v. Asheville Radiological Group, PA, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), rev'd in part on other grounds, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent

8

conduct was discovered or should have been discovered with the exercise of due diligence. See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), aff'd, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. See 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted. For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[1], the statute of limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). The statute of limitations for an alleged violation of

---

[1] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

    (A) to employ any device, scheme, or artifice to defraud;

    (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

    (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

§ 1702(a)(2)(D)[2] expires three years after the date of signing of the contract of sale.  See 15 U.S.C. § 1711(a)(1).  This limitations period, however, may be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Generally, under North Carolina law, the issue of "when fraud should be discovered in the exercise of reasonable diligence is a question of fact for the jury."  State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542, 548 S.E.2d 391, 397 (2003).  Where, however, "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of

---

[2] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed."  15 U.S.C. § 1703(a)(2)(D).

reasonable diligence is established as a matter of law." <u>Drinkard v. Walnut Street Sec., Inc.,</u> No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiff, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiff's claims are time barred. The Plaintiff became aware of Grey Rock lots being sold at discount in 2006 and determined at that time he was the victim of fraud. At the very least, then, the Plaintiff's claims were barred years before he filed the present lawsuit against the Bank.

The Plaintiff contends that his knowledge of wrongdoing on the part of the *Developer* does not equate to knowledge of the *Bank's* involvement in the alleged fraud. Even assuming that this is true, however, the Plaintiff has failed to establish that he acted with reasonable diligence to discover the underlying facts supporting any of his claims against the Bank prior to the expiration of the applicable statutes of limitation. The Plaintiff took possession of his Lots upon closing on February 24, 2005, yet he waited over six years to initiate this action. The Plaintiff has failed to present a forecast of evidence that he did *anything* in this interim period to discover his causes of action against the Bank, nor has he shown that the Bank

committed any affirmative act of fraudulent concealment to frustrate discovery despite his due diligence.

For all of these reasons, the Court concludes that the Plaintiff's claims are time-barred.

### B. ILSA Claim

Even assuming that the Plaintiff's claims are not time-barred, the Plaintiff's claims under the ILSA are also subject to dismissal because the Plaintiff has failed to present a forecast of evidence that Bank of America is a "developer" or "agent" within the meaning of the Act or that Bank of America engaged in a scheme to defraud the Plaintiff during the lot purchase.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA. See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA." Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the undisputed forecast of evidence demonstrates that the Bank was not a co-developer with or agent of Land Resource. Bank of America provided no funding for the Grey Rock development. [Doc. 33-15, Affidavit of Jonathan Rainey ("Rainey Aff.") at ¶ 5]. Further, Bank of

America did not sell the lots to the Plaintiff and was not a party to the Purchase Agreement.

To the extent that the Plaintiff contends that the Bank engaged in marketing activities on behalf of the developer, the Plaintiff has failed to present a forecast of evidence that the alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiff has not presented any forecast of evidence that Bank of America engaged in any marketing of *Grey Rock*, as opposed to the loan products it offered to Grey Rock purchasers.

The Plaintiff also argues that because he never received a HUD property report from Land Resource, as required by the ILSA, he had the right to rescind the Purchase Agreement. The Plaintiff contends that Ford's alleged misrepresentations somehow prevented him from subsequently rescinding his Purchase Agreement within the statutory two-year period. See 15 U.S.C. § 1703(c). Notably, the Plaintiff does not allege such a claim in his Complaint regarding a violation of the ILSA, 15 U.S.C. § 1703(a)(1)(B). Notwithstanding such argument, however, the Plaintiff has not presented any forecast of evidence that the Bank was aware that the Plaintiff had not received a Property Report or that it misrepresented any material facts in order to induce the Plaintiff to refrain from rescinding the

purchase agreement on this basis. In any event, this argument is belied by the Purchase Agreement itself, wherein the Plaintiff specifically certified that he had received a copy of the Property Report. Accordingly, to the extent that the Plaintiff attempts to argue that the Bank induced him to forego a statutory right to revoke the Purchase Agreement, this argument fails.

For all of these reasons, the Court concludes that the Bank was not a "developer" or "agent" of Grey Rock within the meaning of the ILSA. Accordingly, the Plaintiff's claims under the ILSA are dismissed.

## C. Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). Additionally, the party must demonstrate any reliance on the false representations was reasonable. See id. "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiff had with Ford in the course of securing financing for his lot purchase do not support a claim of fraud. First, most of Ford's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a potential investment. "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud." Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984). North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Plaintiff, however, has failed to present a forecast of evidence that Ford made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiff claims to have been misled by Ford's representations regarding the high demand for Grey Rock lots (or North Carolina land in general), the Plaintiff has failed to present a forecast of evidence that such statements were actually false. Furthermore, to the

extent that the Plaintiff claims to have been misled by Ford's representations that the lot would increase in value over time and that he would be able to re-sell his lots before the loan period expired, such representations "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Ford's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence that the Plaintiff's reliance on such statements was reasonable. "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")).

As the Fourth Circuit has noted, reliance on "booster statements" of "enthusiastic agents" is unreasonable because such statements "are to be

expected." See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part). The Plaintiff contends that Ford's statements are distinguishable because his statements were made not in course of promoting of the Bank's loan products but rather were made in course of promoting the *developer's* product, that is, the Grey Rock development, and that he made such statements with "seeming objectivity." [Doc. 35 at 17]. At bottom, however, Ford was engaged in the marketing of one thing: the Bank's financial services. That he appeared to affirm and approve of the Plaintiff's decision to purchase in Grey Rock does not change this fact.

Further, it was unreasonable for the Plaintiff to rely on Ford's opinions when the Purchase Agreement expressly warned the Plaintiff:

> **Disclaimer:** Seller and Purchaser acknowledge that they have not relied upon the advice or representation, if any, of Broker (or Broker's associated salespersons) relative to any consequences of this agreement and the sale of the Property, the purchase and ownership of the Property, the condition of the Property, the availability of utilities to the Property, or the investment potential or resale value of the Property. Seller and Purchaser both acknowledge that if such matters are of concern to them, they have sought and obtained independent advice. Purchaser acknowledges that Broker (or Broker's associated salespersons) are representatives of the Seller and are not acting by or for Purchaser in any capacity).

[See, e.g., Purchase Agreement, Doc. 33-9 at ¶ 25].

Finally, the Plaintiff's claim of reliance is unjustified because he had ample opportunity to conduct an independent investigation of the property and reach his own conclusions about the development and its risks prior to purchasing the property but failed to do so. As the North Carolina Court of Appeals has explained:

> In cases involving the purchase of real property, "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting RD & J Properties v. Lauralea–Dilton Enters., LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)). Here, the parties were engaged in an arm's length transaction. The Plaintiff was a sophisticated investor, seeking to "flip" the property in a relatively short period of time for a profit. Significantly, the Plaintiff has not presented a forecast of evidence to suggest that the Bank denied him the opportunity to

inspect the property or that he was otherwise induced to forego additional investigation as a result of Ford's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiff. In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers. <u>Id.</u> at 429, 617 S.E.2d at 666. When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices. <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the developer summary judgment, but the Court of Appeals reversed. In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the developer and could not otherwise be readily or easily verified. <u>Id.</u> at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiff has failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in Grey Rock. Moreover, the Plaintiff has failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Plaintiff. Indeed, the Plaintiff had many means available to him to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property. The Plaintiff, however, chose to forego any independent investigation of his investment prior to purchase. Under these circumstances, the Bank cannot be held liable for the Plaintiff's failure to conduct his own due diligence.

Further, the Plaintiff's asserted belief that the Bank would "protect his investment" was unjustified because his relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiff was making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to

communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development].”), cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) (“a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party”).[3]

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the Plaintiff's fraud claim.

### D.    Chapter 75 Claim

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show “(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business.” Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991).  A deceptive practice is one that has “the capacity or tendency to deceive the average consumer, but proof of actual deception is not required.”  Id. at 461, 400 S.E.2d at 482.

---

[3] To the extent that the Plaintiff bases his fraud claim on the Bank's use of allegedly inflated appraisals, the Plaintiff has not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiff has offered no forecast of evidence that he relied on these appraisals in purchasing their property. Indeed, the Plaintiff never even saw an appraisal before entering into the purchase agreement.

To the extent that the Plaintiff's Chapter 75 claim is derivative of hid claims for fraud and violations of the ILSA, such claim also fails for the reasons set forth above. See SilverDeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Plaintiff contends that the Bank violated Chapter 75 by "align[ing] itself with the developer, promoting Grey Rock as an investment, and creating loan programs around it." [Doc. 35 at 18]. The Plaintiff's assertions that the Bank should be held liable for its close association with Land Resource, however, are insufficient to state a claim under Chapter 75 absent a forecast of evidence that the Bank was an actual or apparent agent of the developer. See In re Fifth Third Bank, 217 N.C. App. at 211-12, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Plaintiff appears to have abandoned his Chapter 75 claim to the extent that such claim was based on a theory that the use of inflated

appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice. Even if the Plaintiff were to pursue this theory, however, his claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that the Plaintiff did not even see an appraisal prior to closing and, in any event, his Purchase Agreement was not dependent on such appraisal. As such, the Plaintiff could not have reasonably relied on the appraisal in proceeding with his lot purchases. See In re Fifth Third Bank, 217 N.C. App. at 211, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have suffered, we conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

Finally, the Plaintiff cannot establish an unfair or deceptive act based on the Bank's ostensible failure to prevent him from finalizing his lot purchase during the origination and underwriting process. The Bank's role in this transaction was to provide financing; it had no contractual duties to the Plaintiff outside of that role. See Camp, 133 N.C. App. at 560, 515 S.E.2d at 913. The Bank had no obligation to advise the Plaintiff regarding the quality of the investment for which he sought financing. See In re Fifth

Third Bank, 217 N.C. App. at 213, 719 S.E.2d at 180 (noting that lender has no "legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").[4]

In sum, the Plaintiff has not presented any forecast of evidence establishing that the Bank committed any unfair or deceptive act during the Plaintiff's lot purchase. Accordingly, the Court concludes that the Bank is entitled to summary judgment on the Plaintiff's claim under Chapter 75.

## V. CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law.

---

[4] Because the Court concludes that the Plaintiff's Chapter 75 claim should be dismissed on the merits, the Court need not address the Bank's argument that the Plaintiff's place of residence outside of the State of North Carolina precludes their recovery under Chapter 75.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 33] is **GRANTED**, and this action is hereby **DISMISSED**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge